**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JEFFREY BURKE, | : | |
|      Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:15-CV-01012 (VAB) |
| | : | |
| APOGEE CORPORATION, d/b/a IMPACT | : | |
| PLASTICS, and SUPERIOR PLASTICS | : | |
| EXTRUSION COMPANY, INC., | : | |
|      Defendants. | : | |

<u>**MEMORANDUM AND RULING**</u>

Jeffrey Burke ("Plaintiff") brought this action against Apogee Corporation ("Apogee")

and Superior Plastics Extrusion Company, Inc. ("Superior Plastics") (together "Defendants").

The Court held a bench trial from February 13, 2017 through February 16, 2017. During the

course of this trial, ten (10) witnesses testified and sixty-four (64) exhibits were admitted into

evidence.[1] The parties filed proposed findings of facts and conclusions of law on May 5, 2017

and responses to their initial filings on May 19, 2017.

The Court now sets forth its findings of fact and conclusions of law under Federal Rule of

Civil Procedure 52(a)(1), and, as explained below, finds for Defendants on all counts of the

Second Amended Complaint.

**I.     FINDINGS OF FACT**

Under the terms of an employment agreement between Plaintiff and Defendants, Jeffrey

Burke had an opportunity to purchase a five percent (5%) "shadow share" interest in Apogee and

Superior Plastics, when he worked there. Once this interest had been purchased, Defendants

would be required to buy back that interest at the time of Mr. Burke's separation from the

---

[1] Although not dispositive to the outcome of this case, as discussed later in this ruling, Exhibits 116, 118, 121 and 121a are also admitted into evidence for the same reasons that similar documents, such as Exhibits 117 and 120, were admitted into evidence at trial. Thus, Mr. Burke's pending Motion for Admission of Exhibits, ECF No. 99, is **GRANTED.**

companies. While Defendants dispute the existence of any such agreement and ever representing that Mr. Burke could have an ownership interest in either company, the Court finds otherwise. Mr. Burke, however, has failed to prove by a preponderance of the evidence that he actually purchased the shadow shares. Thus, when Mr. Burke was involuntarily terminated from the companies, Defendants did not have a contractual obligation to pay him for the value of these shares.

### A. Relationships between the Parties

In 1970, Steven Ryan started Impact Plastics, Inc., a plastic sheet extrusion company. Tr. III, 520:6-17. Mr. Ryan remained the sole owner of Impact Plastics, Inc. until 1992, when David Kingeter joined the company. *Id.* After joining the company, Mr. Kingeter purchased an approximately forty-nine percent (49%) ownership share and Mr. Ryan and Mr. Kingeter became joint owners of Impact Plastics, Inc. *Id.*

In 1992, Impact Plastics, Inc. changed its name to Apogee Corporation ("Apogee"), while continuing to conduct business under the trade name "Impact Plastics." *Id.* at 520:18-20. A few years later, in 1995, Mr. Ryan and Mr. Kingeter acquired Superior Plastics Extrusion Company, Inc. ("Superior Plastics"), a separate company that had recently undergone a reorganization through bankruptcy. *Id.* at 534:17-25 – 535:4. Mr. Ryan and Mr. Kingeter each owned a fifty percent (50%) share in Superior Plastics and continued owning and operating Apogee, even after taking ownership over Superior Plastics. *Id.*; Tr. III, 515:19-23.

After acquiring Superior Plastics, Mr. Ryan and Mr. Kingeter conducted their plastic sheet extrusion business through both Apogee and Superior Plastics, with Apogee focusing on brokering resin and selling plastic sheet and Superior Plastics focusing on manufacturing. *Id.* at 529:20-24. Apogee formally ceased operations in 2007, though it continued to exist as a

separate legal entity, and Superior Plastics officially began using the name "Impact Plastics" as its trade name at that time. *Id.*

Customers of Apogee and Superior Plastics understood the two companies as belonging to the same overall entity, Impact Plastics. For example, Tom Barry, who formerly worked as an independent sales representative for Defendants, testified that he considered Apogee and Superior Plastics as being "always under one roof" and "like one and the same[.]" Tr. II, 473:17 – 474:1-15. Similarly, Andrew Fitzsimmons, who did business with Defendants for around twenty years, testified that he was doing business with one company, Impact Plastics, even though he noticed that the company's trucks sometimes read Superior Plastics. Tr. II, 446:12-25 ("I only knew Impact Plastics, other than what I saw on their trucks."). Mr. Ryan himself treated the two companies as components of a single entity, and the companies shared resources, equipment and space. Tr. I, 33:13-17 ("I always just considered everything Impact Plastics, which is somewhat basic."). While they were legally separate entities and were never officially part of the same company, they functioned in practice as one company.

Jeffrey Burke had been close friends with David Kingeter for over a decade when Mr. Kingeter approached Mr. Burke about partnering with Apogee. Tr. I, 59:5 – 61:8. Mr. Kingeter first approached Mr. Burke about working for Apogee in 1994, and Mr. Burke declined. *Id*. Mr. Kingeter approached him again in 1995, around the time Mr. Kingeter and Mr. Ryan were acquiring Superior Plastics, and the parties entered into discussions about employment. *Id.* Mr. Burke had a successful career in the plastics industry at the time, and he was working at a company called BASF, when he and Mr. Kingeter began discussing this opportunity. *Id.* Mr. Burke joined the company in January of 1996, after Mr. Ryan and Mr. Kingeter had already acquired Superior Plastics. Tr. I, 54:10-16.

### B. Employment Contract

Mr. Burke signed an employment contract with both Apogee and Superior Plastics in January of 1996. Tr. I, 10:18 – 91:18. Exhibit 109 is the operative employment contract for Mr. Burke.[2] *Id.*

In this contract, the company name for Superior Plastics is misstated as "Superior Plastics Extrusion, Inc." Ex. 109 at 1. Although Defendants deny that "Superior Plastics Extrusion, Inc." was intended to refer to Superior Plastics, Mr. Kingeter testified that the phrase did not refer to any other recognized company, *see* Tr. I, 9:13-18, suggesting that the misstating of the company name in the text of was more likely than not a typographical error on the part of the drafters.

The employment contract provided Mr. Burke with the "right and privilege of purchasing up to five (5) percent in shadow shares of the outstanding stock" of Apogee and Superior Plastics.[3] *Id.* at 3. The purchase price of this five percent shadow share interest was to be "fixed at the book value of the Corporation at the fiscal year end December 31, 1995." *Id.* The contract, however, does not specify how Mr. Burke was to purchase this interest. *Id.*

In the event of Mr. Burke's death or termination, Defendants' contractual obligation was to repurchase "all shadow shares of stock owned by" Mr. Burke. *Id.* Under the contract, in the event of involuntary termination, the cost of the shares at the time of repurchase were to be

---

[2] Mr. Kingeter's challenge to the authenticity of Exhibit 109 is not credible. During trial, Mr. Kingeter insisted that Exhibit 109 was not the employment contract he remembered; however, Mr. Kingeter conceded that Mr. Burke did not fabricate Exhibit 109, and he did not provide the Court with any other employment contract pertaining to Mr. Burke. Additionally, Mr. Ryan separately confirmed that Exhibit 109 was the operative employment contract, casting further doubt on Mr. Kingeter's representations.

[3] "Shadow stock" is commonly distinguished from common stock in that shadow stock, also known as "phantom stock," is a deferred compensation arrangement to reward high-level employees and does not result in the awarding of actual stock. *See* 2 Federal Tax Guide to Legal Forms § 7:149 (2d ed.) (In a shadow stock arrangement, "the employee is not given actual stock, and none is set aside…. When the deferral period ends, the employee receives cash, stock, or other property equal to the stock's or property's value at the time of payout.").

calculated based on the "fair market value of the shadow stock," *id.*, whereas in the event of death or voluntary termination, the cost of the shares were to be calculated based on the "book value of the Corporation at the fiscal year-end in which death or voluntary termination occurs." *Id.* This repurchase obligation is the only obligation on the part of Defendants noted in the contract with respect to the shadow shares; the contract does not make any reference to a right to equity payments as a component of any purchased ownership interest in shadow stock. *Id.*

### C. Representations of Ownership

Particularly when interacting with customers and potential business partners, Defendants regularly held out Mr. Burke as having an ownership role within the companies, even though, as discussed in further detail below, he had never purchased an ownership interest. Defendants also represented that Mr. Burke was an owner when securing an additional life insurance policy on his behalf, and did not directly challenge Mr. Burke's assertions that he was an owner, until after his termination.

### 1. Conversations with Individual Customers

Mr. Burke has established that certain individuals who worked with Defendants perceived him as having an ownership interest in Apogee and/or Superior Plastics, and that, on at least three separate occasions, Defendants either directly or indirectly represented to those individuals that Mr. Burke was a partial owner of the companies. During trial, three individuals presented credible testimony regarding Defendants' representations surrounding Mr. Burke's ownership interest: Andrew Fitzsimmons, Bob Carrier, and Tom Barry.

Mr. Kingeter made statements suggestive of an ownership interest on the part of Mr. Burke during a dinner meeting with L'Oreal representatives in 2008. Tr. I, 210:23 – 211:25. The testimony of Andrew Fitzsimmons, a long-time customer of Defendants, established that,

during this meeting, Mr. Kingeter described Mr. Burke as having "skin in the game," which Mr. Fitzsimmons understandably took to mean that Mr. Burke had an ownership interest. Tr. II, 451:18 – 452:23. Mr. Kingeter also did not correct Mr. Burke when Mr. Burke referred to himself as an owner during that conversation, and neither Mr. Burke nor Defendants have presented evidence that Mr. Kingeter ever challenged or corrected that notion in a private conversation with Mr. Burke following the interaction with Mr. Fitzsimmons. Mr. Kingeter's categorical denial at trial that he never used the phrase "skin in the game" is not credible, as Mr. Fitzsimmons seemed to recollect the conversation clearly and had no identifiable motive to misrepresent Mr. Kingeter's statements for purposes of this trial. Tr. III, 639:16-24.

Mr. Kingeter also made statements consistent with an ownership interest on the part of Mr. Burke during a dinner meeting in 2012 at the National Plastics Exposition in Orlando, Florida. Tr. I, 212:19 – 214:8. According to the testimony of Bob Carrier, the owner of another plastics company that did business with Defendants, Mr. Kingeter described Mr. Burke as a part owner of the companies during that dinner. Tr. II, 329:15 – 332:19. Defendants claim that Mr. Carrier's recollection is based solely on Mr. Burke's representations, not statements made by Mr. Kingeter. Defendants further suggest that Mr. Carrier's testimony is not fully accurate since he was under the influence of alcohol during that dinner. Tr. II, 332:3-13. Mr. Carrier's recollection, however, did not seem to be impaired in any way and, like Mr. Fitzsimmons, Mr. Carrier had no identifiable motive to misrepresent Mr. Kingeter's statements at trial. Thus, the Court finds that it is more likely than not that Mr. Carrier was telling the truth and that Mr. Kingeter did describe Mr. Burke as a part owner.

By deposition testimony, Tom Barry, who had previously worked with Defendants as an independent representative, testified at trial that Mr. Kingeter referenced Mr. Burke's "equity

position" during a dinner meeting in New York City sometime after 2000. Tr. II, 469:2 – 470:9. Defendants have not contested this statement. Defs. Response Br. at 7, ECF No. 115. Each of these three individuals confirmed that, based on Mr. Kingeter's statements and the nature of Mr. Burke's role, they perceived Mr. Burke to be an owner. Thus, the Court finds that, on each of these occasions, Mr. Kingeter affirmatively represented to third parties that Mr. Burke had an ownership interest in Apogee and/or Superior Plastics.

### 2. Life Insurance Policy

In 2006, Defendants secured an additional one-million-dollar life insurance policy for Mr. Burke. Ex. 125; Tr. II, 304:23 – 305:11. Brendan Conry, Defendants' insurance agent, unequivocally noted on the life insurance policy application that Mr. Burke was an owner with a five percent interest in the company. *Id.* at 310:22 – 311:6.

Mr. Burke claims that this application accurately reflects his ownership interest, and that, consistent with this interest, Defendants purchased the additional life insurance policy for the purpose of repurchasing Mr. Burke's shadow shares in the event of his death. Pl. Prop. Findings of Fact at 15-16, ECF No. 112; Tr. II, 291:7 – 292:6. Defendants, on the other hand, claim that they applied for this policy simply because it had a lower premium than Mr. Burke's existing company-provided life insurance policy. Defs. Response Br. at 7, ECF No. 115; Defs. Mem. of Law at 19-20, ECF No. 114. According to Defendants, the application was not an accurate reflection of Mr. Burke's ownership status, but it was completed in such a way as to ensure eligibility for the new policy. *Id.*

The Court finds that the representations of ownership on Defendants' 2006 life insurance application were inaccurate, as discussed later, and do not confirm the actual existence of any ownership interest on the part of Mr. Burke. The application does indicate, however, that

Defendants were misleading in their treatment of Mr. Burke as an owner during his employment with the companies.

### 3. Employment Disputes and Mr. Burke's Termination

Over the course of several years, Mr. Burke entered into discussions with Mr. Kingeter and Mr. Ryan regarding his salary at the companies and the amount of commission payments he was allegedly owed. Tr. III, 560:20 – 562:6. These discussions led to a meeting in January of 2013 between Mr. Burke, Mr. Kingeter, Mr. Ryan, and Stephen Studioso, Chief Financial Officer for Superior Plastics, during which the parties discussed various mechanisms for resolving Mr. Burke's concerns regarding commission payments. *Id.* During that meeting, Mr. Burke referenced his claim to five percent ownership of the companies, and neither Mr. Kingeter nor Mr. Ryan challenged Mr. Burke's ownership claims at that time. Tr. I, 222:11 – 225:3. The transcript of the meeting demonstrates that Mr. Burke believed himself to be a five percent owner in January of 2013, and that Defendants did not directly challenge that belief. Ex. 132A.

On various occasions before and after the January 2013 meeting, Defendants attempted to reach an agreement with Mr. Burke regarding his commission payments, but they were unsuccessful. Tr. III, 592:20 – 594:10. On November 20, 2014, Defendants sent Mr. Burke a termination letter notifying him that his employment would be "terminated, without cause, effective January 20, 2015." Ex. 139.

Following Mr. Burke's involuntary termination, Defendants did not recognize Mr. Burke's claimed five percent ownership interest and did not purchase any shadow shares from Mr. Burke.

### D. Mr. Burke's Alleged Purchase of Shadow Shares

According to Mr. Burke, he purchased a five percent shadow share interest in Apogee and Superior Plastics during the course of his employment. Tr. I, 122:10-25. He testified that Mr. Kingeter met with him on at least two occasions before 2000 to discuss how he could finalize the purchase of this five percent shadow share interest. Tr. I, 120:10 – 121:3, 128:11-24. The substance of those conversations is reflected in Exhibits 116, 117, 118, 120 and 121, which are financial spreadsheets that detail costs and potential methods of purchasing shadow shares. *Id.* at 125:9 – 126:13, 148:20 – 149:11, 180:6-9. According to Mr. Kingeter, however, these discussions never took place, and the parties never reached an agreement as to how Mr. Burke was to purchase shadow share interest. Tr. III, 598:24 – 600:5. Mr. Kingeter insists that, contrary to Mr. Burke's allegations, Mr. Kingeter had no role in preparing any of the listed exhibits. *Id.*

Based on the evidence presented, it is more likely than not that Mr. Burke and Mr. Kingeter did meet in person on at least two occasions to informally discuss the details of Mr. Burke's potential shadow share purchase in Superior Plastics and Apogee. The various financial spreadsheets from those conversations indicate that Mr. Burke and Mr. Kingeter discussed at some point the cost and potential methods of purchasing a shadow share ownership interest in Apogee and Superior Plastics, although they do not confirm that Mr. Burke acted on any of these potential purchase methods.

Mr. Burke claims to have completed his five percent purchase by 1999, at a total cost of $136,995.80. Tr. I, 130:17-20, 151:4-9. Mr. Burke testified that he completed this purchase in five steps: (1) he returned a 1998 commission check to the company in the amount of $37,893.33; (2) he received a $30,734.27 credit in 1998, representing unpaid commissions owed

to Mr. Burke in that year; (3) he received an "equity distribution" of $8,970 based on the 1997 profits of Superior Plastics and Apogee, which he claims was credited towards his shadow shares; (4) he received another equity distribution of $22,600 based on the 1998 profits of Superior Plastics and Apogee, which he claims was credited towards his shadow shares; and (5) he received a final equity distribution of $40,370 based on the 1999 profits of Superior Plastics and Apogee, from which he paid $36,798.20 to complete his purchase of a five percent (5%) shadow share interest in Superior Plastics and Apogee. As discussed in further detail below, the Court does not find by a preponderance of the evidence that any of these payments were actually made or credited towards the purchase of shadow shares.

### 1. $37,893.33 Commission Check

Mr. Burke testified that he endorsed a $37,893.33 commission check back to Superior Plastics and Apogee as payment for shadow shares. Tr. I, 133:14 – 135:22. The record demonstrates that Defendants did issue Mr. Burke a Form 1099 reflecting the payment of a $37,893.33 commission check to Mr. Burke. Ex. 11. However, there is no documentation demonstrating that Mr. Burke ever endorsed the check back to the companies — there is no written confirmation from either Mr. Burke or Defendants that Mr. Burke endorsed the check, nor is there tax documentation on the part of Defendants demonstrating that the companies earned a one-time payment of $37,893.33 from funds returned by Burke.

Particularly in light of the substantial nature of this payment, the Court does not find that Mr. Burke returned this money to Defendants without any formal confirmation that the amount would go towards his shadow share ownership interest. Thus, there is not sufficient evidence that Mr. Burke made this payment.

## 2. Unpaid Commission Payments

Mr. Burke also testified that an additional $30,734.27 of unpaid commission payments was credited towards his purchase of shadow shares in Superior Plastics and Apogee. Tr. I, 142:15-143:20. Apart from Mr. Burke's own testimony, however, the only evidence of this alleged credit is an unidentified figure in the notes from Mr. Burke's conversations with Mr. Kingeter. *See* Ex. 116, Ex. 120. Apart from Mr. Burke himself, no one offered testimony or documentation confirming that such a credit was actually received by Defendants. Thus, the Court finds that there is not sufficient evidence that Mr. Burke made this $30,734.27 payment.

## 3. Equity Distributions

The remainder of Mr. Burke's claims to ownership are based on "equity distributions" that he allegedly earned during the course of his employment. Tr. I, 151:25 – 152:6. However, Mr. Burke has not produced sufficient evidence that he would have been entitled to distributions of any sort during the course of his employment as an owner of shadow shares.

Apart from the unidentified figures in his notes from conversations with Mr. Kingeter, Mr. Burke has not offered sufficient evidence that the alleged equity distributions were ever made. These distributions would have been attributable to Mr. Burke as income;[4] however, Mr. Burke never reported these alleged distributions on his tax returns.[5] Tr. III, 634:17 – 635:13, 636:1-6.

---

[4] Stock distribution income is a taxable event and would have been reported on federal income tax returns. *See* 26 U.S.C. §§ 61, 63 (defining scope of "income" and "taxable income"); *United States v. Sun Myung Moon*, 718 F.2d 1210, 1222 (2d Cir. 1983) (finding that, because defendant owned stock in a personal capacity, "he should have reported the interest and stock distribution income on his tax returns. Since he failed to do so, his 1973–75 returns were false.").

[5] Evidence of such tax payments would have been highly probative, if not dispositive, of whether the alleged equity distributions were actually made and credited towards Mr. Burke's shadow share interest.

Similarly absent is any documentation indicating that either Apogee or Superior Plastics reported making distribution payments to its shareholders in the years during which Mr. Burke allegedly credited his distribution payments towards his ownership of shadow shares. Thus, the Court finds that there is not sufficient evidence that Mr. Burke had "equity distributions" issued and credited to him in order to pay for an interest in shadow shares.

### 4. Formal Records of Ownership

Finally, Mr. Burke's alleged ownership interest in Apogee and Superior Plastics is conspicuously absent from any formal documentation. Although Mr. Burke's contract specifies that shadow shares purchased by Mr. Burke would be "represented by newly issued shares of Shadow Stock of the Corporation," Ex. 109, Mr. Burke did not present any share certificates. Mr. Burke was never reported on Apogee and Superior Plastics' corporate tax returns as an owner of the companies, nor did he ever report himself as an owner on his personal tax returns. Tr. II, 416:11-18.

While Mr. Burke likely discussed his potential purchase of shadow shares with Mr. Kingeter, and likely subjectively believed that shadow shares were similar to the ownership of common stock, the Court finds that Mr. Burke has not proven by a preponderance of the evidence that he actually purchased any shadow shares in either Apogee or Superior Plastics.

## II.    CONCLUSIONS OF LAW

In his Second Amended Complaint, Mr. Burke claims that Defendants (1) breached the employment contract by refusing to pay him for shadow shares after his involuntary termination and by failing to pay him certain equity distributions during the course of his employment; (2) violated the implied covenant of good faith and fair dealing by breaching the employment

contract in bad faith; and (3) violated the Connecticut shareholder statute, Conn. Gen. Stat. § 33-946(a), by refusing to provide him with shareholder certificates.

In his Proposed Findings of Fact and Conclusions of Law, Mr. Burke withdraws Count Three of the Amended Complaint, which alleged a violation of Conn. Gen. Stat. § 33-946(a), leaving only the breach of contract and bad faith claims. Pl. Prop. Findings of Fact at 25, ECF No. 112.

For the reasons stated below, the Court finds for Defendants on the two remaining counts of the Second Amended Complaint.

## A. Count One: Breach of Contract

Mr. Burke claims that Defendants breached the operative employment contract by failing to pay him for the value of a five percent (5%) shadow share interest at the time of his involuntary termination from the companies. Sec. Am. Compl. at ¶ 46, ECF No. 69. He also alleges that Defendants breached the contract by refusing to pay him certain alleged lost equity payments. *Id.* at 9. The Court disagrees with Mr. Burke and finds in favor of Defendants.

"The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291 (2014). The Court concludes that Mr. Burke is not entitled to recover under the contract because he has failed to establish the essential element of performance.

### 1. Formation of Agreement

The Court first concludes that Mr. Burke did form an agreement with both Apogee and Superior Plastics. Defendants insist that Mr. Burke's employment agreement did not bind Superior Plastics in any way, citing the misspelling of the company name in the written contract

and claiming that Exhibit 109 is not an accurate copy of the operative employment agreement. *See* Defs. Mem. of Law at 3-5, ECF No. 114.

The Court finds Defendants' arguments unpersuasive in light of the circumstances. *See Landry v. Spitz*, 102 Conn. App. 34, 57–58 (2007) ("'The parol evidence rule ordinarily prohibits a court from considering extrinsic evidence in interpreting an agreement when that evidence tends to alter the explicit terms of the agreement… However… '[E]xtrinsic evidence is always admissible to explain an ambiguity appearing in the instrument.'") (quoting *Hare v. McClellan*, 234 Conn. 581, 597 (1995)). In light of the close relationship between Apogee and Superior Plastics at the time of the employment agreement, the Court concludes that Mr. Burke entered into a contract with both Apogee and Superior Plastics. Ex. 109. Through this contract, Apogee and Superior Plastics offered Mr. Burke the opportunity to purchase a five percent (5%) shadow share interest in both companies in exchange for the companies' agreement to repurchase that interest at the time of involuntary termination.

### 2. Performance

Notwithstanding the formation of an agreement for the potential purchase of shadow shares, Mr. Burke has not established the second element of performance. "A party cannot recover on a contract unless he has fully performed his obligations under it, has tendered performance, or has some legal excuse for not performing." *Ravitch v. Stollman Poultry Farms, Inc*., 165 Conn. 135, 149 (1973); *see also Stonington Water St. Assoc., LLC v. Hodess Bldg. Co*., 792 F.Supp.2d 253, 266 (D. Conn. 2011) ("In Connecticut, a material failure of performance by one contracting party relieves the other party from any further performance under the contract.").

Under the language of this contract, Defendants' obligation to pay Mr. Burke at the time of involuntary termination was triggered by Mr. Burke's purchase of shadow shares in the

companies. Apart from this purchase, Defendants had no obligation to make any payments to Mr. Burke in connection with shadow shares. *See* Ex. 109 at 3 (providing Mr. Burke with a "right and privilege of purchasing" shadow shares and obligating Defendants to "repurchase all shadow shares of stock owned by" Mr. Burke); *Ravitch,* 165 Conn. at 149 ("Whether the performance of a certain act by a party to a contract is a condition precedent to the duty of the other party to act depends on the intent of the parties as expressed in the contract and read in light of the circumstances surrounding the execution of the instrument Plaintiff's breach of contract claim.").

The evidence presented in support of Mr. Burke's claim that he purchased shadow shares fails to meet the preponderance of the evidence standard required for civil actions. *See Chiulli v. Chiulli*, 161 Conn. App. 638, 646 (2015) ("The general burden of proof in civil actions is on the plaintiff, who must prove all the essential elements of the causes of action set forth in the complaint by a preponderance of the evidence."). Mr. Burke claims to have finalized this purchase using a combination of commission payments and "equity distributions"; however, the claimed purchase is not supported in the record and cannot establish the requisite performance under the employment contract.

### a. Commission Checks and Credits

Mr. Burke seeks to establish by his own testimony that he made two payments towards his shadow share interest from commissions to which he was entitled as a salesman. He specifically claims that he endorsed a commission check back to the company in the amount of $37,893.33 without requesting or keeping a receipt of that transaction, and that he credited $30,734.27 worth of commission payments towards his shadow share interest without any record of that credit being accepted by the companies.

The only documentary evidence Mr. Burke offers in support of these claims are a series of spreadsheets in connection with conversations Mr. Burke had with Mr. Kingeter regarding this purchase. Exs. 116, 117, 118, 120 and 121. These documents do not confirm, however, that Mr. Burke actually made payments towards the purchase of shadow shares in Superior Plastics and/or Apogee. They do not function as a receipt or a confirmation of ownership, nor do they confirm the companies' recognition that any described credits were ever made in practice. No other employees remembered receiving or documenting such payments, and the payments are absent from any records produced on the part of Apogee and/or Superior Plastics. Taken together, the evidence is insufficient to establish by a preponderance of the evidence that these payments were ever made.

### b. Equity Distributions

The remainder of Mr. Burke's claims regarding his purchase of shadow shares are similarly unsupported. Mr. Burke alleges that the majority of his shadow share purchase was made through credits of "equity distributions" he was entitled to receive as a minority owner. Mr. Burke insists that he received these distributions during the course of his employment based on his partial ownership of shadow shares, which he had allegedly purchased through commission payments.

The Court has already concluded that Mr. Burke never made the alleged shadow share payments with money from his commissions. Even if he had purchased shadow shares, however, Mr. Burke has not established that he would have had any entitlement to equity distributions during the course of his employment. Therefore, this proposed method of payment cannot support his claim.

According to Mr. Burke, the phrasing of his employment contract, which provides for the opportunity to purchase "non-voting shadow shares in equity," Ex. 109, confers on him all the benefits of equity ownership apart from voting, including the right to receive distributions as a shareholder. Pl. Response Br. at 2-4, ECF No. 116. In support of this claim, Mr. Burke seeks to equate his employment agreement with Mr. Kingeter's employment contract, which provides in relevant part that "KINGETER shall have the right and privilege of purchasing up to forty-nine (49) per cent of the outstanding stock of IMPACT." Ex. 101; *cf.* Ex. 109 (providing Mr. Burke with the "right and privilege of purchasing up to five (5) per cent in shadow shares of the outstanding stock" of Apogee and Superior).

The parties do not dispute that Mr. Kingeter did receive equity distributions throughout the course of his employment. However, it is also undisputed that Mr. Kingeter owned common stock in Apogee and Superior Plastics, not shadow shares. Unlike the contract with Mr. Kingeter, the ownership opportunity offered to Mr. Burke through his employment contract was consistently limited to the ownership of non-voting shadow shares, not common stock. Ex. 109. As noted previously, the phrase "shadow shares" or "shadow stock" is typically used to refer to an alternative employment benefit that is distinct from common stock and results in specified deferred payments to particular employees. *See* 2 Federal Tax Guide to Legal Forms § 7:149 (2d ed.) (In a shadow stock arrangement, "the employee is not given actual stock, and none is set aside…. When the deferral period ends, the employee receives cash, stock, or other property equal to the stock's or property's value at the time of payout."); *see also Hahn v. Nat'l Bank, N.A.*, 99 F.Supp.2d 275, 277, 280 (E.D.N.Y. 2000) (evaluating whether "phantom stock" plan could be considered a pension plan under the Employee Retirement Income Security Act

("ERISA") and explaining that the arrangement laid out a specific "schedule for when Phantom Stock Awards could be turned in for cash payments or 'exercised.'").

Mr. Burke's employment agreement never references a right to equity distributions based on shadow share ownership during the course of Mr. Burke's employment. Ex. 109. Mr. Burke has not presented any other document describing additional payment entitlements based on the ownership of shadow shares, nor has he presented any extrinsic evidence suggesting that the parties otherwise agreed that Mr. Burke was entitled to receive benefits from the offered shadow share interest beyond the repurchase of those shares at the time of termination. Accordingly, the Court concludes that Mr. Burke has failed to establish by a preponderance of the evidence that he was paid equity distributions during his employment, or that any such distributions were credited to his ownership of shadow shares.

As explained in the findings of fact above, Mr. Burke did not establish by a preponderance of the evidence that he actually purchased an interest in shadow shares in either Apogee or Superior Plastics. Defendants had no contractual duty to repurchase shadow shares or to make equity payments in the absence of performance on the part of Mr. Burke. Accordingly, without establishing this essential element of performance under the contract, Mr. Burke cannot prevail on his breach of contract claim.[6]

## B. Count Two: Breach of the Implied Covenant of Good Faith and Fair Dealing

In addition to his breach of contract claim, Mr. Burke also argues that Defendants violated the covenant of good faith and fair dealing implied in every contract. Am. Compl. at ¶¶

---

[6] Defendants assert affirmative defenses of statute of limitations, statute of repose and laches as to Mr. Burke's breach of contract claims, arguing that Mr. Burke's breach of contract claim is time-barred with respect to alleged lost equity distributions during the course of Mr. Burke's employment. Answer to Sec. Am. Compl. at 8-9, ECF No. 78. The Court does not reach the merits of these affirmative defenses, however, as Mr. Burke has failed to establish an essential element of his underlying breach of contract claim. Accordingly, Defendants' pending Motion to Amend Answer, ECF No. 95, is **DENIED AS MOOT**.

47-51, ECF No. 69; *see Warner v. Konover*, 210 Conn. 150, 154 (1989) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.") (internal quotations and marks omitted).

To constitute a breach of this duty, "the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.,* 269 Conn. 424, 434 (2004) (internal quotations and marks omitted). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Bad faith means more than mere negligence; it involves a dishonest purpose." *Habetz v. Condon*, 224 Conn. 231, 237 (1992) (internal citations omitted).

"[B]ecause the covenant of good faith and fair dealing only 'requir[es] that neither party [to a contract] do anything that will injure the right of the other to receive the benefits of the agreement,' it is not implicated by conduct that does not impair contractual rights." *Capstone Bldg. Corp. v. Am. Motorists Ins. Co*., 308 Conn. 760, 795 (2013) (quoting *Home Ins. Co. v. Aetna Life & Casualty Co*., 235 Conn. 185, 200 (1995)); *see also Legacy Grp. of Am., Inc. v. N. Am. Co. for Life & Health Ins*., 336 F. App'x 87, 91 (2d Cir. 2009) ("Because Legacy conceded that there was no breach of the agreement, it is unable to claim that there was a breach of the implied covenant of good faith and fair dealing where that claim is based on the same agreement and set of facts as the breach of contract claim."); *Geysen v. Securitas Sec. Servs. USA, Inc*., 322 Conn. 385, 404 (2016) ("A breach of the implied covenant of good faith and fair dealing contract

claim, however, is different than a wrongful termination claim because the former focuses on the fulfillment of the parties' reasonable expectations.").

In *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.,* 380 Conn. 760 (2013), the Connecticut Supreme Court examined an alleged breach of the covenant of good faith and fair dealing in connection with a contract regarding the performance of certain construction work. There, the court explained that:

> The implied duty of good faith and fair dealing is a purely instrumental duty intended to protect insureds' rights to receive their policy benefits…. A bad faith cause of action not tied to duties under the insurance policy must therefore fail as a matter of law. A review of our cases involving the duty of good faith and fair dealing reveals that violations of express duties [under the contract] are necessary to maintain a bad faith cause of action.

*Id.* at 797 (citing cases; internal quotations and marks omitted). Thus, there can be no breach of the implied covenant of good faith and fair dealing where the accused party did not have a duty to act under the underlying contractual agreement.

Here, since the Court has found that Mr. Burke did not make the required shadow share payments under his employment contract, Apogee and Superior Plastics had no contractual obligation to pay Mr. Burke the value of those shadow shares when he was terminated. Any misleading or seemingly unfair actions on the part of Apogee and Superior Plastics with respect to Mr. Burke's potential interest in receiving those shadow shares cannot result in a breach of the implied covenant of good faith and fair dealing because Defendants' actions did not prevent Mr. Burke from receiving his shadow shares. Mr. Burke's failure to pay for the shadow shares, however, did.

"The plaintiff clearly ha[s] the burden of proving his case on the complaint... It [is] the plaintiff's burden to prove his own case by a preponderance of the evidence." *Vigorito v. Allard,*

143 Conn. 70, 71 (1955); *see also Chiulli*, 161 Conn. App. at 646.  As noted above, Mr. Burke has failed to prove by a preponderance of the evidence that Defendants' failure to make payments in connection with his alleged shadow share interest constituted a breach of his employment contract, and Mr. Burke's failure to make the payments necessary under the employment contract for his shadow share interest foreclosed his claim of a breach of the implied covenant of good faith and fair dealing. Mr. Burke thus cannot prevail on Count Two of the Amended Complaint.

## III.     CONCLUSION

The Court finds that Mr. Burke has not proven the claims asserted in the Second Amended Complaint by a preponderance of the evidence.  Accordingly, the Court finds for Defendants on Counts One and Two of the Second Amended Complaint, and since it was withdrawn, the Court dismisses Count Three as well.

The Clerk of the Court is directed to enter judgment and close this case.


SO ORDERED this 4th day of August, 2017 at Bridgeport, Connecticut.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE